IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| SPLIT PIVOT, INC., | |
| Plaintiff, | Case No. 12-cv-639 |
| v. | **EXPERT REPORT OF STEVE DOMAHIDY** |
| TREK BICYCLE CORPORATION, | |
| Defendant. | |

I.  Background

1. My name is Steve Domahidy. My current place of residence is 9219 Sugarstone Cir., Highlands Ranch, CO 80130. I have been retained by Split Pivot, Inc. to provide expert testimony in its case against Trek Bicycle Corporation, pending in the United States District Court for the Western District of Wisconsin.

2. I have been working in the cycling industry for over 25 years.

3. I am currently the owner of Domahidy Consulting, LLC, a consulting company specializing in the cycling industry. As the owner of Domahidy Consulting, I consult for bicycle companies on a wide variety of topics including, but not limited to, engineering, design, industrial design, graphics, marketing, brand identity, brand management, business, supply chain management, sourcing, factory relations, quality control, imports and other related activities within the cycling industry. I am sought after as a consultant due to my depth of knowledge about all aspects of the industry, my success within the industry,

and my longevity in the industry. Companies look to Domahidy Consulting as a one stop shop for everything from creating a brand, to increasing market share, to solidifying brand awareness and identity, and finally to complete ground up frame designs. I have been retained as a consultant by some of the most influential bicycle companies in the world including Factor Bikes, a UK based company launching a new brand based around their Formula One composites and electrical engineering, the prototype of which has already been heralded as the most advanced road bike in the world; Budnitz Bikes, by founder Paul Budnitz who currently has seven different works of art on display at the Museum of Modern Art; and Faraday Bikes, an electric bike company that is changing the way the world views the e-bike with its simple elegance, advanced electronics, and seamless integration.

4. In 2004, prior to starting Domahidy Consulting, I co-founded Niner Bicycles, a mountain bicycle brand that builds only 29" wheel mountain bikes. When I co-founded Niner Bicycles, I had amassed over fifteen years of experience and a wealth of knowledge in the bicycle industry. In the beginning, my partner in Niner Bicycles had no experience in the bicycle industry and contributed initial start up capital and business entrepreneurship. Because of my prior experience in the industry, I was the sole resource for everything from design to delivery of all Niner bikes. In the beginning I was responsible for designing all Niner bike frames, negotiating with manufacturers in Asia to build prototypes and production frames, finalizing production and ongoing quality control, working with a graphic artist to come up with logos and

brand identity, choosing color ways and product names, working with web designers to build the web site, working on marketing campaigns, brochures, catalogs, advertisements, and other related marketing efforts and selling, picking, packing and shipping frames.

5. When Niner began operations, bikes equipped with 29" wheels were a very small niche within the bicycle industry, and there was only one other production company building 29" wheel mountain bikes. The wheel size and technology was considered "fringe" at the time, and the bicycle industry generally did not want to embrace a different wheel size than the then-standard 26" wheel. I had a vision for a different type of bike and was motivated to leave my impression on the industry. I saw the 29" wheel as the next evolution in mountain bike technology and knew that customers would embrace such a bike if someone could design and build one very well. I grew Niner from a two person startup into a major bicycle company. Niner's growth was unprecedented, averaging 120% per year for the first seven years, even in the face of the economic collapse. The 29" wheel is one of the reasons that the bicycling industry as a whole showed growth for the past three years. Niner is considered one of the pioneers of the 29" wheel and so is also considered one of the main reasons that the 29" wheel size was adopted. 29" wheels are now the standard wheel size within the industry for cross country mountain bikes. Even Trek has recognized the importance of 29" wheel bikes. In addition to its Superfly 100, Hifi, and Rumblefish models, all of which were previously marketed under the Gary Fisher brand name,

Trek has, within the last few weeks, introduced nine new 2014 model year bikes: the 2014 Fuel EX 7 29, Fuel EX 8 29, Fuel EX 9 29, Fuel EX 9.7 29 Carbon, Fuel EX 9.8 Carbon, Remedy 7 29, Remedy 8, 29, and Remedy 9 29, each of which features 29" wheels.

6. As the head of research and development for Niner Bicycles from 2004 through 2011, I designed or oversaw the design of every single Niner frame and component. I hold two United Stated Patents with four additional applications pending. Included in my patents is a suspension patent called 'CVA,' which I developed while at Niner (US Patent No. 7,934,739). CVA stands for "Constantly Varying Arc" and the patented suspension design was specifically built to overcome some of the challenges with 29" wheels, their geometry, and related issues with the larger wheel size and suspension movement and clearance. Niner Bicycle models have been heralded by the press and riders alike and have won ride and design awards around the world, including two IF (Internation Forum Design) Design Awards and one IF GOLD Design Award (the most prestigious award given by the IF Award body). IF is an internationally recognized design award body based in Hannover, Germany (http://www.ifdesign.de/index_e). IF has been judging designs for a myriad of products since 1953 and the IF Design Award is considered to be among the highest praise for designers the world over. In addition to the design awards, Niner bikes have received numerous other awards from the cycling press, including 'Best in Class' by What Mountain Bike (a UK magazine), Best Bike of 2012 by Outside Magazine, and 'Best New

4

Mountain Bike' by Bicycling Magazine. The most recent bike I designed for Niner, the RIP 9 RDO, won Outside Magazine's "2013 Gear of the Year" award.

7. In addition to establishing 29" wheels as a preferred mountain bike wheel size, I also designed the most advanced carbon fiber rigid fork for mountain bikes. Since its release in 2009 and subsequent IF Design Award (see above IF Design Award description) in 2010, the Niner Rigid Carbon fork has been the most copied rigid fork in recent history and has changed the landscape of rigid fork technology for the mountain bike industry.

8. Since my early childhood I have had a profound love of bicycles and so when it was time to get a job in high school, I got a job at Dairy Ashford Schwinn, a local bicycle shop in Houston, TX, and excelled. Within one month on the job I became the number one sales person, and have remained a top sales person in every store I worked at since. My memory for technical detail combined with a love and passion for the sport and a truly sincere desire to create that love in others became the building blocks of my entire career.

9. In 1990, I was the head mechanic for Rick Kent who placed 6th in the Race Across America, a grueling 3000 mile bike race that he completed in 9 days, 21 hours.

10. From 1990 to 1997, I continued to work in sales and management in several bike shops including Bike Route in Houston, Texas, Helen's Bike Shop in Santa Monica, California, and finally Supergo Bike Shop, also in Santa Monica.

11. In 1997, Supergo owner Alan Goldsmith hired me to work on a full suspension design for his house brand, Access. Supergo in 1997 was a two

store bicycle chain and online retailer. My input into the design was based on my years of experience in mountain bikes, my understanding of geometry and its effects on handling and riding characteristics, and my technical knowledge of suspension, shocks, shock tuning, bicycle assembly and maintenance. I poured over, analyzed, rode, and dissected every new technology that was introduced since the early 1990s and was considered the "expert" in these areas by the staff at Supergo. Before Mr. Goldsmith tasked me with the creation of this full suspension bike, I was the in-store Custom Build Manager and handled every high-end custom build that came into the shop. As Mr. Goldsmith was expanding the Access brand from hardtail frames to full suspension frames, he needed input from someone who truly understood suspension design and its nuances. Mr. Goldsmith informed me that I was that person, and sent me to Taiwan to work directly with the factory on the frame's development.

12. In 2000, I was hired by Chicago based component supplier SRAM for their marketing department but also played a role in product testing and development. SRAM is a component manufacturer working at the highest levels of the cycling industry. In addition to my role in the marketing department, I worked side by side with SRAM's sponsored professional athletes at mountain bike races to insure that their equipment was performing at optimum levels. I also took SRAM's athletes' feedback on function and design after practice and race runs so I could report back to the product development teams at SRAM for ongoing development.

13. In 2001, Mr. Goldsmith brought me back to Supergo where I became the product manager and designer of in-house bicycle brands Weyless and Scattante. By 2001, Supergo had expanded their store count to five, with locations from Santa Monica to San Diego. Each of the locations was averaging $17 million in annual sales, including the online store. The Weyless and Scattante brands had already been founded by Mr. Goldsmith, but were struggling under his direction. Tasked with resurrecting the brands and making them viable, I worked with graphic artists for a total revamp of both brands while simultaneously redesigning the bikes from the ground up. Within two years, I took the two brands from roughly $50,000 in annual revenue to more than $5,000,000 in annual revenue and when Supergo was purchased by Performance Bicycles, Inc., I was the only employee retained. My first ground up redesign for the Weyless brand, Supergo's in house mountain bike brand, won Mountain Bike of the Year from Mountain Bicycling Magazine.

14. In preparing this report and reaching my opinions regarding this case thus far, I have read, in full, the following documents:
    a. Split Pivot Patent 7,717,212
    b. Split Pivot Patent 8,002,301
    c. Trek Patent 7,837,213
    d. Trek Patent 7,703,785
    e. Trek Patent 8,235,409
    f. Complaint

```
```
g. Defendant's Answer, Affirmative Defenses, and Counterclaims

h. First Amended Complaint

i. Defendant's Answers, Affirmative Defenses, and Counterclaims to First Amended Complaint.

j. Trek Bicycle Corporation's Supplemental Objections and Responses to Plaintiff's First Set of Interrogatories (NO.6)

k. Trek Bicycle Corporation's Objections and Responses to Plaintiff's First Set of Interrogatories (NOS. 1-10)

l. Plaintiff's Second Supplemental Answers to Defendant's First Set of Interrogatories

m. Plaintiff's Amended Answers to Defendant's First Set of Interrogatories

n. Plaintiff's Reply to Defendant's Answer, Affirmative Defenses and Counterclaims to Plaintiff's First Amended Complaint

o. Trek Bicycle Corporation's Objections and Responses to Plaintiff's First Set of Document Requests (NOS. 1-91)

p. Trek Bicycle Corporation's Supplemental Objections and Responses to Plaintiff's First Set of Interrogatories (NO.9)

q. Trek Bicycle Corporation's Objections and Responses to Plaintiff's Second Set of Interrogatories (NOS. 11-13)

r. Plaintiff's Responses to Defendant's First Set of Requests for Production of Documents and Things

s. Plaintiff's First Supplemental Answers to Defendant's First Set of Interrogatories

t. Plaintiff's Answers to Defendant's First Set of Interrogatories

u. Trek's Invalidity Contentions

   i. Exhibits 1, 1-1, 1-2

   ii. Exhibits 2, 2-1, 2-2

   iii. Exhibits 3, 3-1, 3-2

      iv. Exhibits 4, 4-1, 4-2

      v. Exhibits 5, 5-1, 5-2

      vi. Exhibits 6, 6-1, 6-2

      vii. Exhibits 7, 7-1

v. Trek Bicycle Corporation's Supplemental Objections and Responses to Plaintiff's First Set of Interrogatories (First Supplemental Response to NOS.1 and NOS.2, and Third Supplemental Response to NO.6)

w. In addition, I reviewed various Trek bicycle models in issue in this case during an inspection at Whitewater, WI on May 9, 2013. The models I reviewed were: 2012 model year Trek Fuel EX 6, 9 (assembled), 9.9; 2013 model year Trek Fuel EX 5, 6 (assembled), 7, 8 (assembled), 9, 9.8, 9.9; 2012 model year Trek Lush (assembled); 2013 model year Trek Lush; 2012 model year Trek Remedy 9.9; 2013 model year Trek Remedy 9.9; 2013 model year Trek Rumblefish (assembled); 2012 model year Trek Session 88, 9.9; 2013 model year Trek Session 88, 9.9; 2013 model year Trek Slash 7; and 2013 model year Trek Superfly 100 (assembled). I base my understanding about the model years of these Trek bicycles on the assembly date that accompanied each bicycle I reviewed. For those bicycles including an assembly date of August or later, I have assumed the example made available for review were part of the following model year.

15. The question that was presented to me, and for what my expert opinion was sought at this time, is 'what defines a person of ordinary skill in the art of bicycle or vehicle suspension design at the time of the inventions of the Split Pivot patents?'. I am not an attorney, nor have I received legal training. Accordingly, with the assistance of Split Pivot's counsel, I have reviewed various legal cases and materials regarding what a "person of ordinary skill in the art" is and how one determines and describes such a person. The cases and materials I have reviewed in this regard include: 'Patent Law, 3rd Ed.' by Janice Mueller, 'Patents and the Federal Circuit' by Robert L. Harmon, Daiichi Sankyo Co., Ltd., v. Apotex, Inc., KSR Int'l Co. v. Teleflex Inc., and Ryko Mfg. Co.

v. Nu-Star, Inc. In reaching my opinions and conclusions, I have been guided by, and believe I have followed, these cases and materials.

16. In the design of mechanical devices, such as suspension components that exist on bicycles or vehicles, the level of ordinary skill can be achieved in a much broader sense than that of someone who would be ordinarily skilled in an art such as brain surgery or chemistry. For example, in the fields of brain surgery or chemistry, a person having ordinary skill would presumably require an intimate knowledge of complex subject matter, requiring years of education. Therefore, the learning mechanism for such fields is severe.

17. The bicycle industry is one in which engineers, designers, product managers, and other related jobs within the industry, are very often filled with those who have a love for the sport itself and mold their schooling and related work into their passion for bicycles. In the art of design of mechanical objects, and more specifically, suspension components for bicycles, one having ordinary skill is typically somebody who has a passion for bicycles and, but not in all cases, either a mechanical engineering degree or some amount of engineering training.

18. One having ordinary skill in the art of bicycle suspension design would have a sliding scale combination of practical bicycle related experience and schooling. For instance, one with ordinary skill in the art might have 10 years of experience riding, racing, and experiencing full suspension mountain bikes while only have limited schooling in the field of mechanical engineering or design. While at the other end of the spectrum, one with ordinary skill in

10

the art might have a more limited amount of practical experience with bicycles and suspension such as two to three years, coupled with more schooling, such as a Mechanical Engineering degree or even higher engineering accreditation. I do not believe that one could attain ordinary skill in the art of bicycle suspension design without some level of practical knowledge or time spent 'in the field' understanding this technology, whether on bicycles or other vehicle suspensions.

19. One having ordinary skill in the art of suspension design for bicycles has an understanding of prior bicycle and bicycle suspension designs. Usually, if not always, this person's intimate knowledge of bicycle and bicycle suspension design results from having sold, ridden, studied, looked at, or pondered over bicycles, or more specifically, bicycle suspensions, in photographs, brochures, sales ads, or physically from showroom floors or riding out on the trail itself.

20. Because of the limitations of human power in relation to bicycle suspension design, a person having ordinary skill in the art of suspension design would look to more modern prior art to understand the modern bicycle obstacles and nuances. Bicycle suspension in mountain bikes can be dated back to the late 1980s. This is particularly the case because bicycles from previous eras were not designed for, nor regularly ridden off-road, much less on trails having a significant downhill component. Thus, while certain bicycles from previous eras may have had rudimentary suspension systems of some sort, they were designed to enhance rider comfort, not to increase control, and pedaling and braking efficiency, which are paramount considerations when

designing mountain bikes intended for cross-country and downhill riding. Therefore, in my opinion, one having ordinary skill in the art would look primarily, if not exclusively, to the late 1980s and later to study and contemplate prior art.

21. Given the rate at which advancements in bicycle suspension technology have come within the mountain bike industry, only those with extraordinary skill in suspension design have made significant leaps in bicycle suspension related performance. In my experience, truly new inventions that change the face of bicycle suspension design come along once every three years, roughly.

22. Those having ordinary skill in the art fill in the gaps between these roughly three year spans in innovation by refining existing designs. Often, these refinements come in the form of easier moving linkages or bearing technology, or structural changes in the frame and moving components.

23. Recognizing design flaws such as unwanted flexation of suspension components that causes poor performance or decreasing weight of the frame is often tasked to those who have ordinarily skill in the art.

24. While it is impossible to fully define one 'having ordinary skill in the art' and the exact attributes that that entails, in conclusion, this person of ordinary skill in the art as it relates to bicycle suspension design would have a combination of practical riding experience and mechanical design schooling. As stated previously in my report, this scale can be a sliding scale, with more experience and less school at one end, and more school and less experience at the other, starting with at least 7 years of experience and some design

school to at least three years of practical experience and a degree in mechanical or structural engineering or higher. Those who have an abundance of both school AND experience tend to rise to higher levels within the profession of bicycle design, and perhaps take on more design responsibilities for the company they work for, but the spark that takes somebody from ordinary to extraordinary is an indefinable archetype that is not part of this report.

25. I believe this definition of one who has ordinary skill in the art of bicycle suspension design would reflect somebody with ordinary skill in the art at the time of the invention. I know there is a gap between the time when Dave Weagle first sketched ideas for the design in 2005, and when the initial patent was filed in 2006, but my definition stands true for either time established for the invention.

26. In addition to the question of 'ordinary skill in the art', Split Pivot council asked me to review Dave Weagle's deposition and other related documents regarding possible breach of contract and/or theft of trade secrets posed in this case. For this, I relied on all of the readings as stated above in paragraph 14, plus the following:

    a. Plantiff's Answers to Defendant's Second Set of Interrogatories (NOS. 12-16)
    b. Transcription of Videotaped Deposition of Dave Weagle, May 23, 2013
    c. Email chain and information regarding Enduro Bearing MR1728

13

27. Based on the Plantiff's answer to interrogatory number 12 and direct quotes taken from Trek employee emails, Mr. Weagle's deposition, and other documents I have reviewed, it is my opinion that the Trek's employees were likely more interested in obtaining confidential information from Mr. Weagle than from a sincere desire to work with him or license Split Pivot.

28. It appears, based on the information that I have reviewed, that the Trek employees who met with Mr. Weagle on April 26, 2007 had ulterior motives for doing so than were expressly given in the emails leading up to the meeting. I base this opinion on my years of experience in the bicycle industry, and several specific facts. One such fact is the nature of Joe Vadeboncoeur's email, in which he informed Mr. Weagle that Trek was working on a similar suspension design. Given the nature of this information, it would not have been prudent for Trek employees to further engage Mr. Weagle knowing that they were potentially working on a parallel technology. It is my opinion, that in similar situations, most bicycle companies would not have a confidential meeting with a competitor or potential competitor whom they knew to be developing a new technology similar to one they claimed to have developed. My opinion in this regard is further reinforced by the email sent by Jose Gonzalez to Mr. Weagle identifying topics Trek wished to discuss during the April 26, 2007 meeting. That email, the types of questions asked by Trek employees present at the meeting on April 26, 2007, and Trek's subsequent usage of the information provided by Mr. Weagle during that meeting, lead me to conclude that Trek likely proceeded with the April 26,

2007 meeting with Mr. Weagle with the intention of gathering intelligence and market insights. Based on my experience in the bicycle industry, I believe it was far more likely that Trek met with Dave for these reasons rather than due to a professed interest in licensing Split Pivot. While I believe my opinion in this regard is well-founded and correct, I want to stress that this opinion is only based on the information I have at my disposal.

29. According to Mr. Weagle's sworn deposition testimony, his impression based on the emails and meeting were that Trek employees were more interested in Split Pivot than the DW Link, about which Trek also sought to have certain discussions. Many of the specific topics discussed by Mr. Weagle at the meeting on April 26, 2007 seem to have been incorporated, in some cases directly, in Trek marketing materials and/or blogs published in support of Trek's ABP-equipped bicycles. In my experience in the bicycle industry, the fact that Mr. Weagle's disclosures to Trek ended up in Trek's marketing materials was almost certainly not a coincidence.

30. In addition, Trek's use of the Enduro bearing MR1728 (Enduro's nomenclature for a special makeup 'MR' and a 17mm inner diameter, 28mm outer diameter '1728') demonstrates Trek's use of information provided at the April 26, 2007 meeting that Mr. Weagle expected to be kept confidential. The MR1728 bearing is very unique. For typical suspension designs in which there is a pivot near the rear axle (i.e.: Horst Link design frames such as Specialized MTB's or 'Faux Bar' designs where this pivot is just ABOVE the rear axle mounting point), this pivot is traditionally quite small. The pivots

15

in these types of bikes experience very little rotation. Therefore, because of space and weight constraints, companies manufacturing frames with these pivot locations keep them small and light. In addition, larger diameter bearings (an outside diameter of 28mm is a larger bearing size) are more often used on 'main' pivot locations, that is, locations on a full suspension frame that see the most amount of rotation and load. In these applications, it is beneficial to have a wider bearing. The Enduro MR1728 bearing designed and sourced by Dave Weagle was only 6mm wide and thus was unusual compared to typical bearings of this diameter that might have been used in 'main' pivot locations and the like. The typical types of larger Enduro bearings that may have been in use in early 2007 would have been 7-8mm wide. The MR1728 bearing is a very unique bearing that had not been used in the bicycle industry prior to the April 26, 2007 meeting between Mr. Weagle and Trek, when it was specifically discussed. Had Trek's employees not discussed this bearing with Mr. Weagle, it is highly unlikely in my opinion they would have known of the MR1728 bearing's existence. Certainly, they would not have had any reason to use the bearing. The fact that this bearing was eventually used in ABP equipped bikes is, in my opinion, difficult to look past and brings in to question any and all engagement Trek had with Mr. Weagle.

31. I intend to continue studying and analyzing the information I have relied on in preparing my expert report in this matter. Because of that, I may, from time to time, revise or expand my opinion to reflect additional analysis

relating to facts currently known to me or that I may become aware of in the future. I reserve the right to modify or supplement the opinions set forth in this report as necessary, and particularly as new information is brought to my attention. Also, in presenting my testimony, I may utilize certain charts, graphs, and other presentation materials that are not yet prepared as demonstrative exhibits to assist in presenting my opinion in this matter.

Executed this 19 day of June, 2013

_____
Steve Domahidy